# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

### January 2018 Term

_____

Nos. 15-0589, 16-0992, & 17-0502

_____

**FILED**
**June 5, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## LAWYER DISCIPLINARY BOARD,
### Petitioner

## V.

## DAVID S. HART,
## A MEMBER OF THE WEST VIRGINIA STATE BAR,
### Respondent

_____

### Lawyer Disciplinary Proceeding
### Nos. 14-01-248, 14-01-392, 15-01-024, 15-01-152, 15-01-155, 15-01-479, 15-01-530, 16-01-221, and 16-01-561

### LAW LICENSE ANNULLED AND OTHER SANCTIONS

_____

### Submitted:  May 15, 2018
### Filed:  June 5, 2018

Andrea J. Hinerman
Senior Lawyer Disciplinary Counsel
Office of Disciplinary Counsel
Charleston, West Virginia
Attorney for the Petitioner

Kyle G. Lusk
Lusk & Bradford, PLLC
Beckley, West Virginia
Attorney for the Respondent

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.  "A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment.  On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record."  Syllabus point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

2.  "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law."  Syllabus point 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

3.  "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the

i

ethical standards of the legal profession." Syllabus point 3, *Committee on Legal Ethics v. Walker,* 178 W. Va. 150, 358 S.E.2d 234 (1987).

4. "As soon as a client has expressed a desire to employ an attorney and there has been a corresponding consent on the part of the attorney to act for him in a professional capacity, the relation of attorney and client has been established; and all dealings thereafter between them relating to the subject of the employment will be governed by the rules applicable to such relationship." Syllabus point 1, *Keenan v. Scott*, 64 W. Va. 137, 61 S.E. 806 (1908).

5. "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syllabus point 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

6. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syllabus point 4, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

7. "A suspended attorney who fails to comply with the provisions of [Rule 3.28 of the Rules of Lawyer Disciplinary Procedure] may have his [or her] license to practice law annulled upon proof by the [Office of Disciplinary Counsel] of the West Virginia State Bar by [clear and convincing] evidence that the suspended attorney failed to comply with the provisions." Syllabus point 3, *Committee on Legal Ethics of West Virginia State Bar v. Keenan*, 192 W. Va. 90, 450 S.E.2d 787 (1994).

8. "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or rectify consequences of misconduct; (5) full and free disclosure to the disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10 ) interim rehabilitation; (11) imposition of other

penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses." Syllabus point 3, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

9. "In a lawyer disciplinary proceeding, a mental disability is considered mitigating when: (1) there is evidence that the attorney is affected by a mental disability; (2) the mental disability caused the misconduct; (3) the attorney's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation, and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely." Syllabus point 3, *Lawyer Disciplinary Board v. Dues*, 218 W. Va. 104, 624 S.E.2d 125 (2005).

**Davis, Justice:**

The Lawyer Disciplinary Board ("LDB") instituted these consolidated lawyer disciplinary proceedings against the respondent, David S. Hart ("Mr. Hart"), who is currently suspended from the practice of law. The disposition recommended by the Hearing Panel Subcommittee ("HPS") included the annulment of Mr. Hart's law license, in addition to other recommended sanctions. The Office of Disciplinary Counsel ("ODC") concurs with the disposition of annulment, but disagrees with certain findings and conclusions of the HPS. Mr. Hart objects to various findings and conclusions of the HPS and asserts that the sanction of annulment is extraordinarily harsh given the factual circumstances. Specifically,

> "Mr. Hart seeks an Order from this Court that suspends any additional punishment that might be imposed by this Court, or that imposes such punishment retroactively, . . . and permits him to return to the practice of law, under supervision and on probation, with any additional punishment imposed to be served in the future if this Court finds Mr. Hart to have violated the terms of probation imposed as part of these proceedings."

Based upon this Court's review of the record submitted, the briefs and argument, and the applicable legal precedent, this Court agrees with the sanction of annulment as recommended by the HPS and, further, adopts the additional sanctions recommended by the HPS.

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

Mr. Hart was admitted to the West Virginia State Bar in 1999 and practiced law in Beckley, West Virginia. On June 9, 2015, this Court filed an opinion imposing a three-year suspension of Mr. Hart's law license and other sanctions. *See Lawyer Disciplinary Bd. v. Hart*, 235 W. Va. 523, 775 S.E.2d 75 (2015) (hereinafter "*Hart I*"). The mandate of this Court in *Hart I* issued on July 22, 2015, and establishes the effective date of Mr. Hart's suspension. In *Hart I*, the HPS recommended a one-year suspension while the ODC sought a two-year suspension. Some description of the issues involved in the Court's decision to suspend Mr. Hart's law license for three years is necessary to appreciate the matters presently before this Court. The suspension ordered in *Hart I* resulted from Mr. Hart's misconduct involving failures to communicate, lack of diligence, failures to respond to client requests for information, lack of competence, failures to expedite litigation, failure to properly separate and account for funds, failures to protect client interests upon termination of representation, and numerous failures to respond to the lawful requests of the ODC for information. *Hart I*, 235 W. Va. at 534, 775 S.E.2d at 86. Additionally, Mr. Hart ignored a directive of this Court and failed to file a brief in *Hart I* such that when he appeared for oral argument, this Court refused to entertain oral argument from him. *Hart I*, 235 W. Va. 526 n.1, 775 S.E.2d at 78 n.1. Among other things, the Court concluded that Mr. Hart demonstrated a pattern and practice of failing to adequately communicate with clients,

neglecting their interests, failing to respond to the ODC, and failing to expedite cases consistent with his client's interests. *Hart I,* 235 W. Va. at 536, 775 S.E.2d at 88. We note that many of the matters presently before this Court involve allegations of the same and similar conduct that occurred during the same time frame as the violations and complaints at issue in *Hart I.*

The lawyer disciplinary matter presently before us involves the consolidation of three additional Statements of Charges that were not considered by the Court in *Hart I.* A Statement of Charges was ordered by the Investigative Panel of the LDB on June 6, 2015, and was filed with this Court on June 22, 2015 (No. 15-0589). The Statement of Charges consisted of five complaints, as detailed below, arising from Christy A. Meadows ("Ms. Meadows"), James D. Swafford ("Mr. Swafford"), an ODC complaint initiated by the Clerk of this Court involving failures to perfect appeals, Michael D. Harvey ("Mr. Harvey"), and Janet L. McComas ("Ms. McComas").

A second Statement of Charges was ordered by the Investigative Panel of the LDB on October 8, 2016, and filed with this Court on October 24, 2016 (No. 16-0992). The Second Statement of Charges included complaints arising from Kevin C. Elliott ("Mr. Elliott"), an ODC complaint initiated by Lindsey Ashley, Esquire ("Ms. Ashley"), and Basil Y. Allen, II ("Mr. Allen").

3

A third Statement of Charges was ordered by the Investigative Panel of the LDB and filed with this Court on June 2, 2017 (No. 17-0502). This Third Statement of Charges involved the complaint of Amber M. Hart ("Ms. Hart"), who is Mr. Hart's ex-wife, and was grounded in contempt proceedings related to their divorce.

We observe, without setting forth the details, that there was an extensive procedural history and motion practice before the HPS. Proceedings were continued due, in large part, to the timing of the complaints and the issuance of multiple statements of charges. The matter proceeded to hearing before the HPS on September 6 and 7, 2017. The HPS heard testimony from numerous witnesses, and voluminous exhibits were admitted into evidence.

### A. Complaints Before the ODC and Findings by the HPS

**1. No. 14-01-284: Complaint of Ms. Meadows.** Mr. Hart represented Ms. Meadows in divorce and custody proceedings, which progressed to include abuse and neglect proceedings, beginning in 2010 and concluding in 2012. Ms. Meadows filed a complaint on May 23, 2014, alleging that Mr. Hart failed to represent her to the fullest of his abilities, did not communicate with her, did not follow through with plans of action, and was unprepared for court. Despite notice of the complaint and requests for information by the ODC, Mr. Hart did not respond to the complaint until March 2015. Ms. Meadows testified at the hearing.

4

The primary issue involves Ms. Meadows' final divorce order and the entry of an order that referred to a "Thrift Savings Plan" instead of a "Thrift Savings Account," which reportedly resulted in unresolved problems related to the proper distribution of funds. Mr. Hart testified extensively about his representation of Ms. Meadows, the various proceedings before the family court, and the protracted abuse and neglect proceedings that resulted in the removal of the children from the physical custody of both parents for a period of time; ultimately, Ms. Meadows was awarded primary custody of the children. Mr. Hart also testified that Ms. Meadows was unsatisfied with equitable distribution matters primarily relating to the marital home. He indicated that separate appraisals were conducted by the parties, but there was no equity in the home. He also submitted documentary evidence regarding his advocacy on behalf of Ms. Meadows.

The HPS concluded that Mr. Hart "provided credible testimony with respect to his communication with Ms. Meadows and his representation of her interests." Therefore, the HPS determined that Mr. Hart had not failed to act with reasonable diligence in violation of Rule[1] 1.3[2] of the West Virginia Rules of Professional Conduct ("Rule" or "Rules"). The

---

[1]On September 29, 2014, this Court entered an order adopting amendments to the Rules of Professional Conduct to be effective January 1, 2015. The conduct at issue herein involves acts occurring both prior to and after the effective date of the amendments. Therefore, in citing the Rules, we include a parenthetical identifying the appropriate effective date regarding the charges and violations.

[2]Rule 1.3, titled "Diligence," provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." (Effective prior to and after January 1,

5

HPS also found that the ODC had not proved by clear and convincing evidence that Mr. Hart violated Rules 1.4(a) and (b)[3] by failing to communicate, inform, or explain matters. Nevertheless, the HPS concluded that Mr. Hart had failed to timely comply with ODC's requests for information, thereby violating Rule 8.1(b)[4] regarding a lawyer's duty to respond to lawful demands for information from the ODC.

**2. No. 14-01-392: Complaint of Mr. Swafford.** Mr. Swafford, a coal miner, retained Mr. Hart to represent him with respect to a serious work-related injury that he sustained in 2008. While riding in a mantrip underground, Mr. Swafford was permanently injured when his leg was caught by the side of the mine, allegedly due to a track failure. As a consequence, Mr. Swafford lost his left leg. The record reflects that there were safety violations regarding the degree of clearance between the track and the mine wall. Additionally, the federal investigative notes suggest that Mr. Swafford improperly had his

---

2015).

[3]Rule 1.4, titled "Communication," provides that "(a) [a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." (Effective until January 1, 2015).

[4]Rule 8.1(b), titled "Bar Admission and Disciplinary Matters," provides that "a lawyer in connection with . . . a disciplinary matter, shall not: . . . (b) . . . knowingly fail to respond to a lawful demand for information from . . . [a] disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6 [confidential information]." (Effective prior to and after January 1, 2015).

6

leg outside the confines of the mantrip. On or about January 28, 2010, Mr. Hart filed a civil action on behalf of Mr. Swafford.

On July 22, 2014, Mr. Swafford filed his complaint alleging that Mr. Hart failed to communicate with him regarding the status of his case, or respond to his requests for a copy of the contract of representation and his file. Mr. Swafford further alleged that his case was dismissed because Mr. Hart failed to respond to discovery and to a motion for summary judgment. Testimony was offered by Mr. Swafford regarding the lack of communication, the lack of advocacy, and the consequences of the loss of his case.

Despite notice and requests for information from the ODC, Mr. Hart did not file a response to Mr. Swafford's complaint until June 23, 2015 – some eleven months after the complaint was filed. In his testimony, Mr. Hart admitted his failures, offered an explanation therefor, and stated that the explanation did not excuse his conduct. Mr. Hart expressed remorse and a recognition that he should have sought assistance from or made a referral to a lawyer more experienced in litigating challenging employee injury cases. The proffered explanation for the failure in representation was the inability to find an expert in order to meet the demands of the cause of action. The record establishes that Mr. Hart initially failed to respond to discovery requests, failed to respond with discovery pursuant to an order granting a motion to compel, and produced discovery on the day of a hearing set for

7

a motion to dismiss for failure to respond to discovery. Thereafter, Mr. Hart failed to respond to additional discovery requests despite extensions of the deadlines for production. Ultimately, a motion for summary judgment was filed to which Mr. Hart filed no response brief. On the day a pretrial conference was scheduled, Mr. Hart filed a motion to continue. The circuit court judge determined a pretrial conference was not necessary and invited the parties to file pretrial memoranda by the close of business the following day. Mr. Hart did not submit a memorandum, and the circuit court granted the motion for summary judgment thereby dismissing the case on February 15, 2013.

The HPS found that Mr. Hart failed to pursue Mr. Swafford's case with reasonable diligence, thereby violating Rule 1.3.[5] Additionally, the HPS concluded that Mr. Hart violated Rules 1.4(a) and (b)[6] by failing to properly communicate with Mr. Swafford, failing to reasonably inform him regarding the status of the case, and failing to promptly respond to his requests for information. Further, the HPS found that Mr. Hart violated Rule 8.1(b)[7] due to his failures to timely comply with the ODC's lawful requests for information.

---

[5]*See* note 2, *supra.*

[6]*See* note 3, *supra.*

[7]*See* note 4, *supra.*

8

**3. No. 15-01-024: Complaint of the ODC.** On January 9, 2015, the Clerk and Deputy Clerk of this Court sent a complaint to the ODC regarding Mr. Hart's representation of two clients: Fabian Boltralik, and Elizabeth Darragh. Mr. Hart had filed notices of appeal and received scheduling orders with dates for perfection of the appeals in both matters. Mr. Hart did not perfect the appeals. On December 8, 2014, the Court issued notices of intent to dismiss if the appeals were not perfected within ten days. Again, Mr. Hart failed to perfect the appeals and failed to communicate with the Clerk of this Court. Both cases were dismissed on January 8, 2015. A written response to the complaint explaining the status of each matter was filed by Mr. Hart on March 20, 2015. The Statement of Charges alleged a violation of Rule 1.1[8] regarding competence and a violation of Rule 3.2[9] for failing to expedite litigation. Consistent with his written response, Mr. Hart testified that the appeals had not been perfected because one of the matters resolved and one was determined to be premature for filing. Mr. Hart did not notify the Clerk and did not withdraw the notices of appeal. Mr. Hart testified that he should have communicated with the Clerk.

---

[8]Rule 1.1, titled "Competence," provides that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." (Effective prior to and after January 1, 2015).

[9]Rule 3.2, titled "Expediting Litigation," provides that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the clients." (Effective prior to and after January 1, 2015).

The HPS concluded that Mr. Hart provided credible evidence that both matters had been resolved such that the appeals were not going to be pursued. While indicating that Mr. Hart should have withdrawn the appeals, the HPS found that his failure to do so did not rise to the level of a violation of the Rules.

**4. No. 15-01-152: Complaint of Mr. Harvey.** On April 6, 2015, Mr. Harvey filed his complaint alleging that Mr. Hart failed to file an appeal following a criminal conviction. Mr. Harvey alleged that he asked Mr. Hart about the appeal and was told that there had been a miscommunication with his assistant about the filing of an appeal. Mr. Harvey also complained about a variety of trial strategy decisions that he believed were erroneous and had contributed to his conviction. Additionally, Mr. Harvey claimed that Mr. Hart failed to answer his and his family's requests for information about the status of the case. On April 15, 2015, Mr. Hart filed a detailed verified response to Mr. Harvey's complaint. Mr. Harvey testified regarding the complaints and the effect of a delay in filing an appeal. Mr. Hart gave lengthy testimony and submitted substantial documentary evidence addressing his representation of Mr. Harvey. Mr. Hart testified that he had not been retained to appeal the conviction and sentence.

Mr. Harvey further explained that his mother had executed a $5,000.00 flat fee retainer agreement with Mr. Hart's firm to represent Mr. Harvey on felony criminal charges.

10

An associate in the office signed the agreement and represented Mr. Harvey. The retainer agreement included a provision that representation was not retained for purposes of any appeal. The associate had limited criminal trial experience: therefore, she sought, and received, Mr. Hart's assistance in the criminal jury trial. The first trial ended in a mistrial following the jury's failure to reach a unanimous verdict. The second trial resulted in a conviction. Mr. Hart took no action regarding an appeal.

Following the conviction, Mr. Harvey complained to the circuit court judge about his representation by Mr. Hart and that no appeal had been filed. The circuit court forwarded Mr. Harvey's correspondence to Mr. Hart. Thereafter, Mr. Hart assisted in having Mr. Harvey re-sentenced in order to facilitate an appeal. Over Mr. Harvey's strong objection, the circuit court judge appointed Mr. Hart to represent him in the appeal and ordered Mr. Harvey to complete an affidavit for the purpose of determining eligibility for appointment of counsel. Mr. Harvey refused to complete the affidavit. Nevertheless, Mr. Hart gathered documents and trial transcripts, and filed a notice of appeal. Subsequently, Mr. Hart was suspended from the practice of law and thereafter proceeded to provide all appeal materials to another lawyer who represented Mr. Harvey in the appeal. Mr. Harvey's conviction was affirmed. *See State v. Harvey*, No. 15-0468, 2016 WL 3383262 (W. Va. June 7, 2016) (memorandum decision).

11

The Statement of Charges regarding Mr. Harvey's complaint alleged a failure to abide by Mr. Harvey's decisions regarding the objectives of appeal in violation of Rule 1.2(a),[10] which addresses the scope of representation. Also alleged were violations of Rule 1.3[11] requiring diligence, Rule 1.4(a) and (b)[12] regarding informing clients, and Rule 3.2[13] directing expeditious litigation.

The HPS concluded that the ODC had not proved by clear and convincing evidence that Mr. Hart had violated the Rules.

**5. No. 15-01-155: Complaint of Ms. McComas.** Ms. McComas filed a complaint on or about March 30, 2015. Previously, Ms. McComas had obtained a default

---

[10]Rule 1.2(a), titled "Scope of representation," provides that

> [a] lawyer shall abide by a client's decisions concerning the objectives of representation, . . . and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

(Effective until January 1, 2015).

[11]*See* note 2, *supra*.

[12]*See* note 3, *supra*.

[13]*See* note 9, *supra*.

judgment in a civil action regarding a failure to make payments on a $30,000.00 promissory note. Mr. Hart represented Ms. McComas in an attempt to collect the default judgment. Ms. McComas complained about Mr. Hart's lack of diligence in pursuing the matter and his failures to communicate. Mr. Hart responded to the complaint on May 8, 2015, with a four-page verified statement detailing his efforts at collection, litigation, and settlement, as well as his communications with Ms. McComas. On September 1, 2015, Ms. McComas wrote to the ODC requesting that her complaint against Mr. Hart be withdrawn. Ms. McComas did not testify at the hearing due to declining health. The ODC advised the HPS that it was declining to pursue the complaint. Accordingly, the HPS dismissed the complaint.

6. **No. 15-01-479: Complaint of Mr. Elliott.** Mr. Elliott filed a complaint on November 9, 2015, alleging that he hired Mr. Hart in November 2007 to represent him with respect to a child support matter. He asserted that attempts to contact Mr. Hart had been unsuccessful and that he last spoke with Mr. Hart on or about October 19, 2015. Mr. Elliott sought a refund of the fee he had paid Mr. Hart in November 2007. Mr. Elliott did not testify at the hearing. In his January 25, 2016, verified answer to the complaint, Mr. Hart described the nature of his representation of Mr. Elliott and represented that it had concluded in 2008. Mr. Hart discussed a phone call from Mr. Elliott in 2011 and further described a call received in October 2015, when Mr. Elliott requested a copy of his file. In a sworn statement given on May 17, 2016, Mr. Hart testified that he provided Mr. Elliott's file to Ms. Hinkle, the

13

attorney who accepted the transfer of many of Mr. Hart's cases. In connection with Mr. Elliott's complaint, the ODC also sought information on Mr. Hart's operating and client trust accounts. Mr. Hart failed to timely respond to the ODC's requests regarding his account information.

The Statement of Charges arising from Mr. Elliott's complaint alleged violations of Rules 1.4(a) and (b)[14] addressing client communication and Rule 1.16(d)[15] regarding steps to be taken by a lawyer upon termination of representation. It also alleged a violation of Rule 8.1(b)[16] regarding the failure to timely respond to the ODC's requests for information.

---

[14]*See* note 3, *supra*.

[15]Rule 1.16(d), titled "Declining or Terminating Representation," provides that,

> [u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

(Effective prior to and after January 1, 2015).

[16]*See* note 4, *supra*.

14

Over the objection of the ODC, the HPS granted Mr. Hart's motion to dismiss the complaint. The HPS concluded that the complaint was time barred pursuant to Rule 2.14 of the Rules of Lawyer Disciplinary Procedure ("LDP Rule"), which provides that a complaint must be filed within two years after the complainant knew, or should have known, of the existence of a Rule violation. The HPS found that Mr. Elliott knew, or should have known, of any possible violations during the time of representation, and before the two-year time period had elapsed.

**7. No. 15-01-530: Complaint of the ODC.** At the direction of a family law judge, Lindsey Ashley, Esquire, filed a complaint on December 10, 2015, alleging that Mr. Hart was practicing law while his license was suspended. According to the complaint, Ms. Ashley was appointed as a guardian *ad litem* for a minor child. Upon meeting with the child's mother, Ms. Ashley learned that the mother had retained Mr. Hart to represent her in a contempt action. The mother provided Ms. Ashley a copy of a credit card statement indicating a payment in the amount of $1,500.00 to the Hart Law Office on or about August 17, 2015, after Mr. Hart had been suspended from the practice of law. Mr. Hart filed a verified response to the complaint on January 25, 2016, indicating that this payment occurred during the time when he had closed his practice as a result of his suspension and was working to ensure that clients had representation. Prior to his suspension, the mother had been a client of Mr. Hart's for several matters including divorce and child custody. The

mother's husband came by Mr. Hart's office and spoke with the assistant helping with the closing of the practice and stated that the mother needed to make a payment. The assistant accepted the payment, believing it was for past work performed by Mr. Hart for which there was an outstanding balance due. Subsequently, Mr. Hart spoke with the mother; realized the payment was intended for new representation; and informed the mother he could not represent her, but that he would speak with Amber Hinkle, Esquire, who was accepting the bulk of Mr. Hart's former clients. Mr. Hart told the mother he would forward the fee to Ms. Hinkle. However, Ms. Hinkle was unable to take the mother's case. Mr. Hart arranged to have Kyle Lusk, Esquire, represent the mother and forwarded the fee payment to Mr. Lusk, who successfully represented her. We observe that these arrangements were not made until November 2015 – some three months after the payment had been made and some four months after the effective date of Mr. Hart's suspension from the practice of law. This Court notes that the mother did not testify before the HPS. As was done in connection with the Elliott complaint, the ODC requested information on Mr. Hart's operating and client trust accounts. Mr. Hart failed to timely respond to the request for his account information.

The Statement of Charges alleged that Mr. Hart failed to properly supervise his nonlawyer assistant in violation of Rule 5.3[17] and accepted a retainer for engagement as an

---

[17]Rule 5.3, titled "Responsibilities Regarding Nonlawyer Assistance," provides that,

attorney while suspended in violation of Rules 1.16(a)(1)[18] and 3.4(c).[19]  It was also alleged

> [w]ith respect to a nonlawyer employed or retained by or associated with a lawyer:
>
> (a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
>
> (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
>
> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
>
> (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

(Effective January 1, 2015).

[18]Rule 1.16(a)(1), titled "Declining or Terminating Representation, provides that "(a) . . . a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if: (1) the representation will result in violation of the Rules of Professional Conduct or other law."  (Effective January 1, 2015).

[19]Rule 3.4(c), titled "Fairness to Opposing Party and Counsel," provides that "[a] lawyer shall not: . . . (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."  (Effective

that Mr. Hart engaged in the unauthorized practice of law in violation of Rule 5.5(a).[20] Finally, it was alleged that Mr. Hart failed to comply with lawful requests for information from the ODC in violation of Rule 8.1(b).[21]

The HPS concluded that Mr. Hart was not practicing law without a license, soliciting clients, or accepting clients while his license was suspended. Thus, the HPS found that the ODC had not proven by clear and convincing evidence that Mr. Hart had violated the Rules of Professional Conduct.

**8. No. 16-01-221: Complaint of Mr. Allen.** Mr. Allen filed a complaint on May 26, 2016, alleging representational issues and lack of communication regarding Mr. Hart's representation of him in a child custody matter. Mr. Allen sought a refund of the retainer fee. Mr. Hart filed an unverified, facsimile response with the ODC on July 27, 2016, detailing the nature of his representation efforts. The record establishes that, although Mr. Allen signed the complaint, it was his parents who instigated the complaint. At the hearing, Mr. Allen testified that Mr. Hart had done what he was hired to do; Mr. Allen had not asked

---

January 1, 2015).

[20]Rule 5.5(a), titled "Unauthorized Practice of Law," provides that "[a] lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so." (Effective January 1, 2015).

[21]*See* note 4, *supra.*

for a refund of the retainer fee; he was pleased with the representation provided; and he did not want to see Mr. Hart prosecuted for an ethics violation. Accordingly, the HPS concluded that the ODC had not proved by clear and convincing evidence that Mr. Hart had violated the Rules of Professional Responsibility.

**9. No. 16-01-561: Complaint of Ms. Hart**. Ms. Hart, the ex-wife of Mr. Hart, filed her complaint on December 5, 2016. Ms. Hart's primary allegations involved Mr. Hart's failure to meet his financial obligations owed to her by virtue of their final divorce order. These allegations included the failure to make payments toward a 2010 marital tax lien; failure to pay $1,000.00 for her attorney's fees; failure to make house payments; and failure to make child support payments. Ms. Hart filed several contempt petitions against Mr. Hart in family court. The family court concluded that Mr. Hart was in violation of the final divorce order; however, the violations were determined to be due to the severe decrease in Mr. Hart's income as a result of his suspension from the practice of law. On January 24, 2017, and March 23, 2017, Mr. Hart responded to the complaints primarily by addressing his inability to meet his financial obligations.

We observe that, in connection with investigating Ms. Hart's complaints, which asserted that Mr. Hart was engaged in the practice of law and that he was earning more income than he had reported, the ODC concluded that there were irregularities associated

with the closing of Mr. Hart's law office following his suspension. The irregularities

allegedly involved the use of bank accounts associated with his law office; the use of his

former law firm's real estate trust account; engaging in a real estate closing subsequent to his

suspension; and failing to adequately supervise the nonlawyer assistant who was involved

in activities related to the closure of Mr. Hart's law practice. Therefore, in connection with

Ms. Hart's complaint, Mr. Hart was charged with violations of Rules 1.15(a) and (b),[22] 5.5(a)

and (b)(2),[23] 1.16(a)(1),[24] and 3.4(c),[25] but these charges were not addressed by the HPS in

---

[22]Rule 1.15, titled "Safekeeping Property," provides, in part, that

> (a) [a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account designated as a "client trust account" in an institution whose accounts are federally insured and maintained in the state where the lawyer's office is situated, or in a separate account elsewhere with the consent of the client or third person. Such separate accounts must comply with State Bar Administrative Rule 10 with regard to overdraft reporting. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

> (b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account, but only in an amount necessary for that purpose.

(Effective January 1, 2015).

[23]Rules 5.5(a) and (b)(2), titled "Unauthorized Practice of Law," provide that

> (a) [a] lawyer shall not practice law in a jurisdiction in

20

its Report. An additional charge for violating Rules 8.4 (c) and (d),[26] regarding misconduct that was alleged with respect to the family court contempt actions, was addressed by the HPS. The HPS found that the contempt finding was related to Mr. Hart's failure to make payments towards his financial obligations and do not reflect a violation of the Rules. Accordingly, the HPS concluded that the ODC did not prove by clear and convincing evidence that Mr. Hart had violated the Rules of Professional Responsibility.

## B.  Factors Considered by the HPS

In addition to the findings made by the HPS in each complaint, the HPS also considered both aggravating and mitigating factors. The HPS concluded that Mr. Hart has prior disciplinary offenses. On September 13, 2007, this Court entered an order of reprimand

violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

(b) A lawyer who is not admitted to practice in this jurisdiction shall not: . . . (2) hold out to the public or otherwise represent that the lawyer is admitted to the practice of law in this jurisdiction.

(Effective January 1, 2015).

[24]*See* note 18, *supra.*

[25]*See* note 19, *supra*.

[26]Rules 8.4(c) and (d), titled "Misconduct," provide that "[i]t is professional misconduct for a lawyer to: . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or] (d) engage in conduct that is prejudicial to the administration of justice." (Effective January 1, 2015).

21

in a matter involving allegations of lack of diligence pursuant to Rule 1.3,[27] failure to

communicate pursuant to Rules 1.4(a) and (b),[28] and failure to respond to requests for

information from the ODC pursuant to Rule 8.1(b).[29] *Lawyer Disciplinary Board v. Hart,*

No. 33328 (W. Va. September 13, 2007) (unreported order). Additionally, the HPS

referenced the opinion of June 9, 2015, in *Hart I* suspending Mr. Hart's license to practice

law for three years.

Significantly, the HPS considered that, in connection with his three-year

suspension, Mr. Hart failed to comply with LDP Rule 3.28(a),[30] which imposes certain duties

and responsibilities upon disbarred or suspended lawyers and mandates notice to clients of

---

[27]*See* note 2, *supra*.

[28]*See* note 3, *supra*.

[29]*See* note 4, *supra*.

[30]LDP Rule 3.28(a), titled "Duties of disbarred or suspended lawyers," provides that

> [a] disbarred or suspended lawyer shall promptly notify by registered or certified mail, return receipt requested, or by first-class mail with the prior consent of the Office of Disciplinary Counsel, all clients being represented in pending matters, other than litigated or administrative matters or proceedings pending in any court [or] agency, of the lawyer's inability to act as a lawyer after the effective date of disbarment or suspension and shall advise said clients to seek advice elsewhere. Failure of a disbarred or suspended lawyer to notify all clients of his or her inability to act as a lawyer shall constitute an aggravating factor in any subsequent disciplinary proceeding.

22

such inability to practice law. Additionally, the HPS found that Mr. Hart failed to change his address with the State Bar as required by LDP Rule 3.28(c).[31] The HPS also recognized that Mr. Hart did not comply with LDP Rule 3.28(c) because he failed to provide an affidavit under seal with this Court detailing the names of clients being represented in pending matters who were notified of the suspension, providing copies of notification letters, listing the fees and expenses paid by each client together with an indication of whether escrowed funds

---

[31]LDP Rule 3.28(c), titled "Duties of disbarred or suspended lawyers," provides that

> [t]he disbarred or suspended lawyer, after entry of the disbarment or suspension order, shall not accept any new retainer or engage as attorney for another in any new case or legal matter of any nature. During the period from the entry date of the order to its effective date, however, the lawyer may wind up and complete, on behalf of any client, all matters which were pending on the entry date. Within twenty days after the effective date of the disbarment or suspension order, the lawyer shall file under seal with the Supreme Court of Appeals an affidavit showing (1) the names of each client being represented in pending matters who were notified pursuant to subsections (a) and (b); (2) a copy of each letter of notification which was sent; (3) a list of fees and expenses paid by each client and whether escrowed funds have been or need to be reimbursed; and (4) an accounting of all trust money held by the lawyer on the date the disbarment or suspension order was issued. Such affidavit shall also set forth the residence or other address of the disbarred or suspended lawyer where communications may thereafter be directed and a list of all other courts and jurisdictions in which the disbarred or suspended lawyer is admitted to practice. A copy of this report shall also be filed with the Office of Disciplinary Counsel.

23

needed to be reimbursed, and an accounting of all trust money held by Mr. Hart at the time the suspension was issued.

The HPS additionally acknowledged that, during the time of the complaints involving the suspension, Mr. Hart was experiencing a period of depression resulting from a very bitter divorce and a failing law practice. Mr. Hart testified regarding his counseling and the discontinuation thereof. He represented that he "probably" would return to counseling if he were permitted to commence practicing law again. The HPS considered Mr. Hart's remorse, noting that he testified regarding his use of the time during his suspension to contemplate the circumstances that led to the suspension as well as considering what he could do differently in order to be successful. Specifically, the HPS found that the mitigating factors were "(1) personal or emotional problems; and (2) remorse." However, the HPS declined to conclude that Mr. Hart was suffering a mental disability causing misconduct such that mitigation should apply under the criteria set forth in *Lawyer Disciplinary Board v. Dues*, 218 W. Va. 104, 624 S.E.2d 125 (2005) (recognizing that a mental disability may be considered mitigation in a lawyer disciplinary procedure when there is medical evidence of a mental disability, the mental disability caused the misconduct, recovery is demonstrated by successful rehabilitation, and recovery arrested the misconduct and recurrence of the misconduct is unlikely).

24

### C. The HPS's Recommendations as to Sanctions

Before the HPS, the ODC recommended that Mr. Hart's law license be annulled; by contrast Mr. Hart sought an additional three-month suspension to be added to the remaining term of his current three-year suspension. The comments of the HPS regarding its "struggle" with Mr. Hart's case bear repeating:

> The complaints in this series of charges occurred in and about the same time as the complaints in the previous charges, and the actions which form the basis of those complaints are consistent with the actions which form the basis of these complaints. The HPS cannot determine that if these complaints had been brought all at the same time, this Court's sanction would have been the same, a suspension of [Mr. Hart's] law license for three years.

> [Mr. Hart's] major problems in the previous case were his failures to respond to the charges and provide reasonable explanations in his defense. Whether those failures were the result of the depression related to his divorce and failing law practice, and [Mr. Hart's] failure to retain counsel to help him in his defense, will never be known, as [Mr. Hart] never presented any evidence to support his defense. Thus, suspension was appropriate.

The HPS observed that Mr. Hart initially ignored the instant charges and failed to respond appropriately to the ODC. Significantly, the HPS indicated it believed that Mr. Hart "provided credible testimony with respect to the complaints, several of which seemed to be filed by clients unhappy with the result, and one of which appeared to be the result of

25

a bitter divorce." The HPS also acknowledged Mr. Hart's retention of an attorney and his receipt of counseling services, which helped him understand the ethics charges against him.

However, of particular concern to the HPS was the complaint of Mr. Swafford, who lost his leg as a result of a workplace injury while employed as a coal miner. Mr. Swafford's personal injury action was dismissed due to Mr. Hart's failure to respond to discovery requests and a summary judgment motion. These errors and omissions were compounded by Mr. Hart's failure to inform Mr. Swafford of the case's dismissal. The loss of the opportunity to advance the case was deemed tragic. Mr. Swafford suffered injury in the dismissal, and the public, legal system, and legal profession suffered harm as a result of Mr. Hart's misconduct. Ultimately, in considering the sanction, the HPS remarked:

> If there had been no previous charges or disciplinary action against [Mr. Hart], the HPS believes that, due to [Mr. Hart's] conduct with respect to Mr. Swafford, and due to [Mr. Hart's] failure to appropriately respond to the charges, and to ODC's request for information, a one year suspension would be an appropriate sanction. The HPS, however, has looked at all the circumstances, and due to the egregiousness of the violations, and because, [Mr. Hart] is currently serving a three year suspension, the HPS believes that it is appropriate for this Court to annul [Mr. Hart's] law license.

Therefore, to this Court, the HPS recommended that Mr. Hart be sanctioned with (1) the annulment of his law license; (2) a direction that, in the event of future reinstatement, his practice be supervised for a period of time to be determined by the HPS

26

presiding over the reinstatement proceedings; (3) a requirement that he comply with the mandates of LDP Rule 3.28;[32] and (4) an order to pay the costs of the disciplinary proceedings.

On February 2, 2018, the ODC filed its consent to the disposition recommended by the HPS. Mr. Hart filed objections to the report and recommendations of the HPS on February 5, 2018.

## II.

### STANDARD OF REVIEW

The standard of review in lawyer disciplinary matters is as follows:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

---

[32]*See* notes 30 and 31 *supra*.

Furthermore, LDP Rule 3.7 provides that, "[i]n order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proved by clear and convincing evidence." While this Court affords deference to the Board, we are responsible for determining the final resolution of lawyer disciplinary proceedings. It is well-settled that "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Committee on Legal Ethics of the West Virginia State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

Additionally, this Court has consistently held,

> [i]n deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. pt. 3, *Committee on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987). Guided by these standards, we proceed to consider the legal arguments and evaluate this disciplinary action.

## III.

### DISCUSSION

While consenting to the disposition recommended by the HPS, the ODC nevertheless asserts that there were a number of errors committed by the HPS in reaching its conclusions of law. Mr. Hart also objects to certain findings of the HPS. We will consider each assertion in turn.

The ODC first argues that the evidence submitted in connection with Ms. Meadows' 2014 complaint proved that Mr. Hart neglected her case and failed to effectively communicate with her following the final hearing in her divorce matter. Ms. Meadows raised a variety of concerns regarding Mr. Hart's representation of her in divorce, custody, and abuse and neglect proceedings. The charges related to the entry of a September 2012 final order addressing equitable distribution and directing the movement of funds from her ex-husband's retirement account to Ms. Meadows' account. Mr. Hart submitted documentation regarding the matter and testified that the court had directed opposing counsel to prepare the order. He indicated that it appeared that a separate retirement benefits order with "magic language" acceptable to the federal government needed to be submitted. Mr. Hart stated that Ms. Meadows informed him that she no longer wanted him to represent her. The record establishes that Ms. Meadows informed her ex-husband's attorney that she was no longer represented by Mr. Hart. Ms. Meadows testified that she unsuccessfully attempted

to solve the problem herself and also stated that she hired an attorney who had been unable to resolve the matter, purportedly due to the passage of time.

Considering the evidence in the Meadows' matter in its entirety, we agree with the HPS that the ODC did not prove by clear and convincing evidence that Mr. Hart violated the Rules in his representation of and communication with Ms. Meadows.

Additionally, as to the Meadows' complaint, we reject Mr. Hart's contention that the HPS erred in finding that he violated Rule 8.1[33] due to his failure to timely comply with the ODC's lawful requests for information. The record establishes that, on May 28, 2014, the ODC notified Mr. Hart of the complaint and requested that he submit a response within twenty days. After receiving no response, the ODC again notified Mr. Hart of the complaint via certified mail. The green return receipt card was received by the ODC on June 26, 2014, indicating that Mr. Hart received the notice on June 25, 2014. Mr. Hart did not respond until March 20, 2015. Accordingly, the HPS properly found a violation of duties owed in connection with disciplinary actions pursuant to Rule 8.1.[34]

---

[33]*See* note 4, *supra*.

[34]*Id*.

30

Next, the ODC asserts that, with respect to Mr. Harvey's complaint, it proved that the Rule violations set out in the Statement of Charges related to Mr. Hart's conclusion of representation. Specifically, the ODC contends that Mr. Hart failed to comply with his obligations to effectively communicate with Mr. Harvey at the conclusion of his second criminal trial. The ODC argues that Mr. Harvey credibly testified that, after his second trial, he informed Mr. Hart that he wanted to appeal the conviction and that Mr. Hart orally responded that he would file an appeal. However, Mr. Hart did not remind Mr. Harvey that the retainer agreement explicitly excluded the filing of an appeal.

The ODC contends that, despite the fact that the initial retainer agreement signed by Mr. Harvey's mother did not include representation for prosecuting an appeal, there was a new, second, or implied, agreement for representation on appeal. It is argued that Mr. Hart agreed to represent Mr. Harvey by appearing as co-counsel of record in the two criminal jury trials. The ODC asserts that Mr. Harvey's testimony, that he expressed a desire to appeal his conviction and that Mr. Hart affirmatively responded, was credible. As further demonstration of the argument that a second attorney-client relationship was established, the ODC points to the fact that the circuit court communicated with Mr. Hart about Mr. Harvey's post-conviction correspondence.

31

We observe that Mr. Harvey's complaints about Mr. Hart related not only to post-conviction matters, but also included numerous trial strategy decisions. Mr. Hart responded at length to all the complaints advanced by Mr. Harvey. The record is replete with voluminous trial transcripts, pleadings, and other material.

The record is plain that Mr. Harvey's mother executed a retainer agreement with an associate lawyer who had limited experience in trying cases – and none in trying felony criminal cases. While she initially handled Mr. Harvey's representation, the associate lawyer asked Mr. Hart to assist her when it became clear that a trial would be necessary. The first trial resulted in a hung jury, and the circuit court judge declared a mistrial. The second trial resulted in conviction. Mr. Hart testified that the judge informed Mr. Harvey of his appeal rights and that he was sure that he, too, explained the appeal rights. Mr. Hart viewed his role as limited to assisting in the trial in an effort to help a less-experienced lawyer. Mr. Hart testified that he heard nothing further from Mr. Harvey until receiving the correspondence Mr. Harvey submitted to the circuit court. Mr. Hart stated that he viewed the correspondence about the appeal as a matter that needed to be addressed, and, thus, proceeded to talk with the prosecutor about re-sentencing. Mr. Hart informed the prosecutor that he had not been retained for appeal purposes. The prosecutor agreed to re-sentencing. Mr. Hart facilitated the process of re-sentencing. We note that the associate attorney,

although a witness at the hearing before the HPS, did not testify regarding her role, communications, or responsibilities relating to Mr. Harvey's right of appeal.

This Court has long established that the attorney-client relationship is a matter of express or implied contract. We have held that,

> [a]s soon as a client has expressed a desire to employ an attorney and there has been a corresponding consent on the part of the attorney to act for him in a professional capacity, the relation of attorney and client has been established; and all dealings thereafter between them relating to the subject of the employment will be governed by the rules relating to such relationship.

Syl. pt. 1, *Keenan v. Scott*, 64 W. Va. 137, 61 S.E. 806 (1908). Clearly, Mr. Hart had an attorney-client relationship with Mr. Harvey by virtue of his trial representation. However, given the nature of the representation agreement, which did not include appellate representation, and considering the totality of the facts and circumstances, it is equally clear that Mr. Hart was not employed by Mr. Harvey, and did not consent to act on Mr. Harvey's behalf, for purposes of appeal. Thus, we conclude that the HPS correctly determined that the ODC had not clearly and convincingly proved a violation of the Rules. However, we observe that the better practice in a situation such as this, where the retainer limits the scope of representation, would be to document the termination of representation. This would seem to be the wiser course of conduct, particularly in criminal proceedings. Such a practice

33

would serve to better protect the substantive and procedural rights of clients, and protect both clients and lawyers from misunderstandings and confusion.

Finally, with respect to Rules violations, we turn our attention to those alleged in connection with Ms. Hart's complaint that were not addressed by the HPS. Mr. Hart previously practiced as a partner with the firm Hayden & Hart. In the spring of 2015, as the disciplinary matters that resulted in suspension were progressing, Mr. Hayden advised Mr. Hart that it was time to dissolve their partnership. The law partnership terminated on or about June 1, 2015, at which time Mr. Hart opened Hart Law Office. Mr. Hart hired Ms. Persinger, a paralegal who worked with him at Hayden & Hart. Importantly, Mr. Hart did not open a client trust account despite the fact that he had received funds related to several real estate transactions and the settlement of a personal injury action after opening Hart Law Office.

Mr. Hart deposited client trust and real estate funds into the Hayden & Hart client trust/real estate bank account in which he had also been holding personal funds. The record establishes that there were several such transactions between June 1, 2015, and November 30, 2015, when Mr. Hart was not a partner in Hayden & Hart and while he was a suspended lawyer. Mr. Hayden testified that there was no agreement for Mr. Hart to continue to access the account following the dissolution of the partnership. He further

34

testified that, upon realizing that Mr. Hart was using the account, he had it closed. The record also reflects that Mr. Hart opened an account titled Hart Law Office that he continued to use for personal matters until January 2016.

A real estate transaction involving Mr. Torrico, a long-time client with respect to real estate transactions, culminated in a closing on July 28, 2015, some six days after the effective date of Mr. Hart's suspension from the practice of law. It appears that the transaction work and documents had been prepared by Ms. Persinger, who had handled real estate transactions at Hayden & Hart with little supervision. Ms. Persinger's testimony was that the engagement for the transaction was prior to June 1, 2015; the title search was perfected; and the closing documents had been prepared prior to the effective date of Mr. Hart's suspension on July 22, 2015. However, the closing had been delayed until July 28, 2015. Ms. Persinger handled the closing, which took place at Mr. Hart's office. Mr. Hart was not present. The deed included a handwritten notation made by Ms. Persinger that it had been prepared by Ms. Hinkle. However, Ms. Hinkle testified that she had not seen the deed, did not typically conduct real estate transactions, had no communication with Ms. Persinger regarding the deed, and received no payment from any source in connection with the deed. Mr. Torrico's check for the transaction was made out to Hayden & Hart. On July 28, 2015, Mr. Hart wrote various checks in connection with the closing to the county clerk's office from the Hayden & Hart account. Mr. Hart also wrote a check to himself for $500.00 on July

35

28, 2015, from the Hayden & Hart trust/real estate account, which was deposited into his David Hart Law Office account.

Based upon the foregoing, we find that Mr. Hart violated Rules 1.15(a) and (b)[35] by commingling his own funds with funds of clients or third parties and by failing to establish a separate client trust account. We further find that the use of the Hayden & Hart accounts when he was not a member of the firm, and while he was suspended from the practice of law, constituted a violation of Rule 5.5[36] regarding the unauthorized practice of law and Rules 8.4(c) and (d)[37] regarding misconduct because the use of those accounts created the appearance that he was authorized to use them and was a lawyer in good standing entitled to practice law. Because Mr. Hart accepted legal fees for a real estate closing from Mr. Torrico after his license to practice law had been suspended, this Court finds that Mr. Hart violated Rule 5.5(a),[38] Rules 8.4(c) and (d),[39] Rule 1.16(a)(1),[40] and Rule 3.4.[41]

---

[35] *See* note 22, *supra*.

[36] *See* note 23, *supra*.

[37] *See* note 26, *supra*.

[38] *See* note 20, *supra*.

[39] *See* note 26, *supra*.

[40] *See* note 18, *supra*.

[41] *See* note 19, *supra*.

36

Thus, in summary, the record reflects two violations of Rule 8.1(b) (bar disciplinary requests for information), one violation of Rule 1.3 (diligence), one violation of Rules 1.4(a) and (b) (communication and information), one violation of Rules 1.15(a) and (b) (safekeeping property), two violations of Rule 5.5(a) (unauthorized practice), two violations of Rules 8.4(c) and (d) (misconduct), one violation of Rule 1.16(a)(1) (representation while suspended), and one violation of Rule 3.4(c) (disobeying suspension obligations). Having resolved the charges and associated Rule violations in this case,[42] we now turn our attention to the appropriate sanctions to be imposed for Mr. Hart's misconduct.

As previously set out, while we afford substantial deference to the findings and conclusions of the HPS, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Blair*, 174 W. Va. 494, 327 S.E.2d 671. It is settled law that

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise

---

[42]We observe that claims made by Ms. Hart alleging that Mr. Hart was employed by lawyers in Beckley, West Virginia, and was receiving payment off-the-books were not proven by clear and convincing evidence. Both Mr. Mize and Mr. Winters testified regarding their use of Mr. Hart's services as a paralegal on an independent contractor basis with no fee sharing and the issuance to Mr. Hart of appropriate documentation for tax purposes. Notably, both lawyers testified to the high quality of Mr. Hart's work product.

provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

Syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1988). Moreover, we analyze these factors with recognition that attorney disciplinary proceedings are not designed solely to punish the attorney. Rather, the disciplinary process is "primarily designed to protect the public, to reassure the public as to the reliability and integrity of attorneys, and to safeguard its interest in the administration of justice[.]" *Committee on Legal Ethics v. Keenan*, 192 W. Va. 90, 94, 450 S.E. 2d 787, 791 (1994). Our review of the record, as well as our analysis of the *Jordan* factors, compels the conclusion that the weight of the factors is not favorable to Mr. Hart.

First, Mr. Hart's conduct violated duties owed to his clients, to the public, to the legal system, and to the legal profession. All of those duties were violated in the matter involving Mr. Swafford. Mr. Hart utterly failed in his representation of Mr. Swafford. Indeed, Mr. Hart violated the most important obligations a lawyer owes to a client when he failed to meet his duties of diligence, communication, and information. He failed to comply with discovery requests despite numerous opportunities and extensions of time to do so. He ignored the requests of opposing counsel and an order entered by the circuit court granting

38

a motion to compel. In essence, Mr. Hart abandoned Mr. Swafford's case. Such conduct brings disrepute to the legal system and the profession. As officers of the court, lawyers have a duty to comply with rules of substance and procedure which shape the administration of justice. The extent of Mr. Hart's failures in representing his client undermines the public interest in the administration of justice and its confidence in the rule of law.

Additionally, Mr. Hart violated his duties to the legal system and the profession by failing to comply timely with the ODC's requests for information in both the Meadows and the Swafford matters, even as other matters were proceeding through the disciplinary process. This behavior is particularly concerning since the legal profession is self-regulating and self-governing. Further, Mr. Hart's commingling of funds and use of a firm trust account during the period of his suspension, and when he was no longer affiliated with that firm, evinces a disregard for fundamental rules conceived in the public interest.

Second, we consider whether Mr. Hart acted intentionally, knowingly, or negligently. "Intent," as defined by the American Bar Association, is present when the lawyer acts with "the conscious objective or purpose to accomplish a particular result." Lawyers' Manual on Professional Conduct, *Model Standards for Imposing Lawyer Sanctions*, § 01:801 Definitions (Am. Bar Ass'n 2012). "Knowledge" is evident when the lawyer acts with "conscious awareness of the nature or attendant circumstances of the

39

conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* "Negligence" is defined as a state where a lawyer fails to be aware of a substantial risk of consequences or result, and the failure amounts to a breach of the standard of care that a reasonable lawyer would exercise. *Id.* We find that the failure to retain an expert in the Swafford matter constituted negligent conduct. However, we find that Mr. Hart subsequently acted with knowledge in failing to advance Mr. Swafford's case with reasonable diligence, failing to communicate with him, and failing to timely comply with the ODC's lawful requests for information. We further find that Mr. Hart acted knowingly when he failed to comply timely with the ODC's requests for information regarding Ms. Meadows' complaints. Finally, we find that the actions of Mr. Hart in connection with the Hayden & Hart trust account and the real estate transaction were intentional.

Third, the injuries caused by Mr. Hart's misconduct were great. We cannot speculate as to the value of Mr. Swafford's lost opportunity to litigate his personal injury claim. However, Mr. Swafford testified that his dealings with Mr. Hart negatively affected his opinion of lawyers. He explained that it was his first involvement with the legal system and it had been "a life changing experience." While Mr. Swafford indicated that he did not want Mr. Hart to lose his law license, he expressed a wish that Mr. Hart could step in his shoes and see what he went through with his repeated attempts to contact Mr. Hart resulting in no e-mails, no phone calls, "no nothing." Indeed, Mr. Swafford first learned that his case

had been dismissed when he was called and informed of that fact by the loan company he had contracted with based upon the pending litigation. Mr. Swafford testified that the loan company contacted him when Mr. Hart repeatedly refused to take their calls regarding the dismissal of the action. According to Mr. Swafford, the litigation loan was entered into with assistance from the Hayden & Hart law firm. Mr. Hart was thus aware of the detrimental financial consequences to be suffered by Mr. Swafford as a result of his failure to diligently prosecute his client's claim.

Fourth, we next consider whether any aggravating or mitigating factors are present. This Court has held that "[a]ggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

The HPS concluded that the aggravating factors present were prior disciplinary offenses, a pattern of misconduct, multiple offenses, substantial experience in the practice of law, and failure to comply with the rules regarding the duties of suspended lawyers pursuant to LDP Rule 3.28. Mr. Hart strongly disputes that his failure to comply with LDP Rule 3.28 regarding the obligations of suspended lawyers should be considered an aggravating factor. While agreeing that he did not "completely" comply with LDP Rule 3.28,

Mr. Hart contends that there was "substantial compliance" on his part. He argues that he complied with the stated requirements of the *Hart I* opinion regarding itemized accounting and reimbursement to clients. Mr. Hart admits that he was not aware of the requirements of LDP Rule 3.28 until it was brought to his attention by the ODC with the filing of the Statement of Charges on October 11, 2016. Thus, he readily admits that he did not file a mandatory affidavit under seal with this Court setting out the name of each client who was notified of the suspension, including a copy of each letter of notification sent, a listing of fees and expenses paid by clients and whether escrowed funds had been or needed to be reimbursed, and providing an accounting. Additionally, Mr. Hart did not provide his change of address to the West Virginia State Bar as was also required by the dictates of LDP Rule 3.28(c).

Mr. Hart contends that notice letters were sent to clients. He points to the fact that the record includes a copy of the notice of suspension letter that was sent to complainant Mr. Allen on August 27, 2015. Mr. Hart testified that a similar letter was sent to each of the clients he represented at the time of his suspension. Ms. Hinkle, the lawyer who accepted the transfer of approximately sixty-some clients from Mr. Hart as a result of his suspension, testified regarding the significant efforts of Mr. Hart in assisting in the transfer of cases with files, prepared pleadings, and memos on the status of each case describing what had been accomplished and what needed to be done.

42

This Court observes that

> [a] suspended attorney who fails to comply with the provisions of [LDP Rule 3.28] may have his or her license to practice law annulled upon proof by the [Office of Disciplinary Counsel] of the West Virginia State Bar by [clear and convincing] evidence that the suspended attorney failed to comply with the provisions.

Syl. pt. 3, *Committee on Legal Ethics of the West Virginia State Bar v. Keenan*, 192 W. Va. 90, 450 S.E.2d 787 (1994). Additionally, this Court recently annulled a lawyer's license to practice law for failing to comply with LDP Rule 3.28. By order entered on January 9, 2015, we annulled the license of a lawyer who had been serving an eighteen-month suspension because he had not complied with the duties of a suspended lawyer as set out in LDP Rule 3.28 and because he had failed to comply with the ODC's lawful requests for information. *See Lawyer Disciplinary Bd. v. Niggemyer*, No. 14-0076 (W. Va. Jan. 9, 2015) (unreported order.)

While it appears that Mr. Hart undertook actions to finalize and complete matters and to assist clients in obtaining legal advice and representation subsequent to his suspension, he simply did not meet the requirements of LDP Rule 3.28. The available record does not allow for a finding that notices of suspension were sent to every client being represented in pending matters by Mr. Hart. Coupled with his failure to file the appropriate affidavit with this Court, together with a copy to the ODC, the HPS properly considered the

lack of compliance with the prescribed duties for suspended lawyers as an aggravating factor.

Additionally, this Court observes that the duties of suspended lawyers include the opportunity to wind up and complete pending matters only during the thirty-day period from the entry date of the order of suspension to its effective date. The affidavit to this Court must then be filed within twenty days of the effective date of suspension. The record before us compels the conclusion that Mr. Hart continued to "wind up" matters through at least November 2015, well beyond the permissible thirty-day period. The record supports the conclusion that, during November 2015, Mr. Hart still was scrambling to address the needs of clients who had not obtained substitute counsel on the eve of scheduled hearings in pending matters. The obligations imposed by LDP Rule 3.28 are not mere procedural formalities that can be disregarded. Rather, they are designed to protect clients and the public at large. Client inventory, accounting, and notice requirements are critical components to affording clients protection and supporting the administration of justice. We conclude that Mr. Hart's failure to comply with the duties of a suspended lawyer as mandated by LDP Rule 3.28 is an aggravating factor that justifies an increase in the degree of discipline to be imposed.

This Court also must consider whether there are any factors that justify a reduction, or mitigation, in the degree of discipline. As we held in Syllabus point 3 of *Lawyer Disciplinary Board v. Scott*,

> [m]itgating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or rectify consequences of misconduct; (5) full and free disclosure to the disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

213 W. Va. 209, 579 S.E.2d 550.

The HPS concluded that the mitigating factors are personal or emotional problems and remorse. Mr. Hart contends that there are several other mitigating factors present. First, relying upon *Lawyer Disciplinary Board v. Plants,* 239 W. Va. 347, 801 S.E.2d 225 (2017), Mr. Hart argues that discipline already has been imposed and should be considered as a mitigating factor to reduce the sanction. His argument is that both the Meadows complaint and the Swafford complaint occurred during the time period of the misconduct resulting in his three-year suspension from the practice of law and involved the same type of misconduct for which a pattern was previously recognized and sanctioned. Mr.

45

Hart contends that *Plants* stands for the proposition that prior discipline may be considered as a mitigating factor in a subsequent disciplinary proceeding to reduce the severity of the sanction imposed.

This Court disagrees. The *Plants* case involved entirely different circumstances with a focus on collateral proceedings and the loss of a public office as a consequence of Mr. Plants' misconduct. The circumstances in *Plants* were unique in that Mr. Plants accepted his removal from public office. Additionally, Mr. Plants had no prior disciplinary record. The Court concluded that, given the particular facts and circumstances of that case, suspension would not serve either the purpose of punishment or deterrent as the removal from a publicly-held office had achieved those goals. Thus, the *Plants* opinion has no relevance to Mr. Hart's circumstances. The imposition of other penalties or sanctions is not a mitigating factor.

Mr. Hart also vigorously argues that the delay in the disciplinary proceedings has worked to his disadvantage. Indeed, we are mindful of the fact that the Meadows and Swafford complaints arose during the same time frame as those resulting in Mr. Hart's three-year suspension. While the complaints were filed in 2014, they were not included with the prior disciplinary proceedings that resulted in Mr. Hart's suspension. The charges involved in the prior disciplinary proceedings had aggravating factors of multiple offenses, a pattern

46

and practice of failing to communicate with clients, chronic neglect of cases, and repeated failures to respond to the requests from the ODC. Mr. Hart compounded his transgressions when he did not file a brief with this Court. Like the HPS, this Court is unable to speculate what the sanction would have been if the Meadows and Swafford complaints had been considered in connection with the proceedings involved in Mr. Hart's three-year suspension.

Mr. Hart additionally argues that the delay is the result of a conscious choice by the ODC to hold the complaints and use them as a sort of prosecutorial strategy to subsequently enhance discipline. He further contends that the formal charges regarding the Meadows complaint were filed in retaliation for his retention of counsel, who he sought to have present at a sworn statement that required rescheduling due to conflicts of the retained counsel. However, the timeline of events does not support Mr. Hart's allegations. The Statement of Charges, including the Meadows and Swafford complaints, indicates that on May 18, 2015, Mr. Hart selected June 4, 2015, as an acceptable date for his sworn statement. Accordingly, on May 19, 2015, the ODC sent Mr. Hart an Investigative Subpoena Duces Tecum requiring his appearance for the sworn statement on June 4, 2015, at 2:00 p.m. On June 3, 2015, by email sent at 4:15 p.m., Mr. Hart requested a postponement because his counsel could not be available for the scheduled sworn statement. Mr. Hart also submitted dates that his counsel would be available for the sworn statement. The ODC promptly responded that there was not an appearance filed by counsel and, unless one was filed, they

47

expected to see Mr. Hart at the scheduled sworn statement. At 1:20 p.m. on June 4, 2015, counsel called the ODC regarding representation and acknowledged that he had not filed a Notice of Appearance. Mr. Hart did not appear at the scheduled sworn statement. On the record before us, the contention regarding prosecutorial retaliation has no merit.

It is abundantly clear that Mr. Hart had a major role in the delay of the disciplinary proceedings which he fails to acknowledge, choosing, instead, to accuse the ODC of prosecutorial misconduct and retaliatory actions. The record is well-documented that he did not submit timely responses to the ODC in the Meadows and Swafford matters. This pattern was consistent with his misconduct that resulted in the three-year suspension. Given the facts, and the extended period of time during which Mr. Hart failed to respond to the ODC, his arguments that the Meadows and Swafford complaints should have been made part of the prior disciplinary action have no merit. The proceedings were not included due to Mr. Hart's utter disregard of his duty to respond to the ODC's lawful requests for information.

Mr. Hart also argues that depression he suffered during the time frame that the ethical violations occurred should be considered in mitigation of any sanction. It is plain that Mr. Hart had personal and emotional problems resulting from a very bitter and acrimonious divorce. Additionally, the law firm in which he was a partner was experiencing difficulties,

48

apparently due to high overhead costs and the divorces of other partners and lawyers in the firm. This Court has no doubt that there was upheaval in the firm that contributed to over-extending itself in the representation of clients thereby compounding the challenges of time and stress. These facts support a finding of mitigation due to personal and emotional problems. However, the record does not reflect that Mr. Hart suffered depression to such an extent that mental disability is a mitigating factor.

In Syllabus point 3 of *Lawyer Disciplinary Board v. Dues*, 218 W. Va. 104, 624 S.E.2d 125, this Court established mental disability as a mitigating factor as follows:

> [i]n a lawyer disciplinary proceeding, a mental disability is considered mitigating when: (1) there is medical evidence that the attorney is affected by a mental disability; (2) the mental disability caused the misconduct; (3) the attorney's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

Mr. Hart discussed what he described as depression and anxiety related to the personal and professional life stress he was suffering. He spoke of his shame, embarrassment, and denial. He explained that he was afraid to reach out for help and avoided matters like the proverbial ostrich with its head in the sand. Mr. Hart did not present expert testimony regarding the nature of his depression. However, he did submit documentary evidence that he self-referred for a forensic psychological evaluation with a

49

report dated February 1, 2016, which referenced a testing and interview date of August 28, 2015, and an undated treatment summary. The documentary record also establishes his participation in five psychotherapy sessions during July and August 2015. According to Mr. Hart, he additionally attended some counseling in the spring and early fall of 2016. Mr. Hart testified regarding the helpful nature of the counseling sessions in advancing his insight and providing strategies for addressing his stress. However, Mr. Hart indicated that his finances presented a barrier to therapy. Mr. Hart testified that he "probably would" continue with therapy in the event he was able to practice law again.

We observe that the limited documentation of record generally indicates a recommendation that Mr. Hart resume and continue to completion his previously undertaken cognitive-behavioral psychotherapy on a weekly basis. It also was recommended that if Mr. Hart returns to the practice of law, he should participate in psychotherapy as a mechanism of support for coping with the strains of practice. Other specific recommendations were set out as well as certain provisional diagnoses. Inasmuch as the documents are under seal, we will not address the specifics contained therein. While the record reflects that Mr. Hart had emotional and personal problems, the evidence does not support a finding of a mitigating mental disability within the parameters established in *Dues*. Specifically, the record lacks evidence that a mental disability caused the misconduct at issue. There simply is no linkage between the misconduct and any mental disability. This is particularly true with respect to

Mr. Swafford's complaint, which initially arose out of professional negligence in failing to retain an appropriate expert and/or obtaining the assistance of other counsel with experience in litigating serious workplace injury cases. The record also does not show that there has been a sustained period of rehabilitation. Moreover, the record does not address the issues of recovery or the potential for recurrence of misconduct in a meaningful fashion. Additionally, the record does not support a finding that Mr. Hart has followed through on the general or specific recommendations contained in the report. Thus, this Court declines to apply mitigation for depression as a mental disability justifying a reduction in the degree of discipline to be imposed.

Taking into account the *Jordan* factors, including, particularly, the aggravating factor of Mr. Hart's failure to comply with the duties of a suspended lawyer, we conclude that the annulment recommended by the HPS and consented to by the ODC is the appropriate sanction for the misconduct at issue.

Finally, we address Mr. Hart's argument that the HPS erred in denying his motion to waive payment of the costs of the disciplinary proceedings. Mr. Hart maintains that the complaints of Ms. Meadows and Mr. Swafford should have been brought as part of the prior disciplinary proceeding resulting in his three-year suspension. He further contends that the other formal charges that did not result in any findings of violation should not have

been brought and evidence a "slash and burn" approach to litigation by the ODC. Mr. Hart suggests that, by virtue of involving him in protracted disciplinary proceedings over the course of some three years, the costs were escalated by the ODC. Mr. Hart argues that given his current financial condition, he should not have to pay the costs of a "mostly unsuccessful and entirely unnecessary ethics prosecution." Mr. Hart represents that he has suffered a substantial decline in income resulting from the suspension of his law license such that the imposition of costs would cause him further undue financial hardship. He indicates that the loss of earnings has had a devastating effect on his family that has become more acute now that he has one child in college and three children at home.

In response, the ODC contends that the HPS, while mindful of Mr. Hart's difficult financial situation, nevertheless concluded that there was no basis to grant his motion to waive the costs of the proceedings. The ODC contends that costs must be imposed because violations were found and a sanction was recommended.

LDP Rule 3.15 provides, in pertinent part, that "[w]hen a sanction is imposed, the Hearing Panel Subcommittee or the Court shall order the lawyer to reimburse the Lawyer Disciplinary Board for the costs of the disciplinary proceeding unless the panel or the Court finds the reimbursement will pose an undue hardship on the lawyer." We conclude that the facts and circumstances established herein do not warrant a hardship waiver of the costs of

52

the disciplinary proceedings. Additionally, in all other respects, this Court adopts the sanctions recommended by the HPS.

## IV.

## CONCLUSION

For the reasons explained above, we impose the following sanctions: (1) Mr. Hart's law license is annulled; (2) in the event that Mr. Hart is reinstated to the West Virginia State Bar in the future, his law practice shall be supervised for a period of time to be determined by the recommendation of the Hearing Panel Subcommittee presiding over the respective reinstatement proceedings and by this Court; (3) Mr. Hart shall comply with the mandatory provisions of LDP Rule 3.28; and (4) Mr. Hart shall pay the costs of the lawyer disciplinary proceedings pursuant to LDP Rule 3.15.

Law License Annulled and Other Sanctions.